Filed 10/8/14 Derboghossian CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HOVSEP DERBOGHOSSIAN, | B246336 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC052140) |
| v. | |
| CURTIS ALLEN HARRIS, II, | ORDER MODIFYING OPINION AND DENYING REHEARING (NO CHANGE IN JUDGMENT) |
| Defendant and Respondent. | |

THE COURT:

It is ordered that the opinion filed herein on September 17, 2014 be modified as follows:

1. On page 7, the first full sentence, which states, "When Harris discovered the recording, he contacted law enforcement and reported the deed as a forgery" is deleted.

2. On page 7, at the end of the first sentence of the first full paragraph beginning with "In August 2009" insert the following as the second sentence of that paragraph:

> Later that month, Harris contacted law enforcement and reported the May 24, 1995 grant deed as a forgery.

3.  On page 13, in the second sentence of the first full paragraph delete "contract and trust-related" and replace with "other" so the sentence reads:

> Whatever merit there may be to DerBoghossian's other arguments, they are based on causes of action and legal theories not presented in his complaint and do not compel reversal of the judgment quieting title to the property in Harris's name.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

_____
PERLUSS, P. J.                    WOODS, J.                    ZELON, J.

Filed 9/17/14 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HOVSEP DERBOGHOSSIAN, | B246336 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC052140) |
| v. | |
| CURTIS ALLEN HARRIS, II, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William D. Stewart, Judge. Affirmed.

Law Offices of Gregory R. Ellis and Gregory R. Ellis for Plaintiff and Appellant.

Law Offices of F. James Feffer and F. James Feffer, for Defendant and Respondent.

————————————

Hovsep DerBoghossian appeals from the judgment entered in this quiet title action in favor of Curtis Allen Harris II. DerBoghossian contends the judgment is not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *DerBoghossian's Complaint*

On February 18, 2010 DerBoghossian filed a verified complaint against Harris and "all persons unknown claiming any legal or equitable right, estate, lien, title or interest" to quiet title to real property located at 649 West California Avenue in Glendale. He attached to his complaint, among other things, a copy of a grant deed purportedly executed by Harris on May 24, 1995 (the May 24, 1995 deed) conveying the property to DerBoghossian and a certified copy of an official record filed with the Los Angeles County Recorder's Office indicating that the conveyance had been recorded on May 27, 2009.

### 2. *Harris's Cross-complaint*

On March 22, 2010 Harris answered the complaint and filed a cross-complaint to quiet title to the property in his name. Harris also sought damages against DerBoghossian for breach of contract and fraud. BAC Home Loans Servicing, LP (BAC) answered both quiet title complaints, asserting it possessed a security interest in the property pursuant to a deed of trust executed by Harris in April 1999 in favor of BAC's predecessor-in-interest, Countrywide Home Loans, Inc. David Moussighi also answered the quiet title complaints and filed a cross-complaint against DerBoghossian asserting a security interest in the property in connection with a loan he had made to DerBoghossian on September 29, 2009. He also asserted causes of action against DerBoghossian for breach of contract and fraud.

### 3. *The Court Trial*

The case was tried to the court after the parties with legal claims waived their rights to a jury trial. DerBoghossian and Harris both testified similarly with regard to their personal relationship and initial involvement with the property but otherwise offered

2

very different versions of events. BAC did not participate in the trial after obtaining a stipulation from all parties that it was the senior lien holder on the property.

a. *The initial purchase of the property by DerBoghossian's brother*

According to the evidence at trial, in August 1994 DerBoghossian's family pooled their financial resources to purchase the property from EMC Mortgage Corporation. To effect the purchase, DerBoghossian's brother, Hagop Derboghossian, obtained a loan in his name, secured by the property. The grant deed conveying the property to Hagop, as a single man, was recorded with the Los Angeles County Recorder's Office in October 1994. DerBoghossian, a former real estate and mortgage broker, negotiated the purchase on behalf of his brother.

b. *The oral agreement between Harris and DerBoghossian*

In early 1995 Hagop DerBoghossian told his family he did not want to remain as record title holder with its attendant risks and responsibilities. DerBoghossian, who had recently purchased two adjacent properties (641 and 645 California Avenue), wanted to purchase the property from Hagop so that the property would remain in the family's real estate portfolio but believed he would not qualify for another loan in light of his debt burden. Harris, a very close family friend whom DerBoghossian thought of as a brother, agreed to assist DerBoghossian by obtaining a loan and purchasing the property in his name. Under the terms of their oral agreement, Harris would serve as record title holder and obtain the benefits of a tax deduction associated with home ownership. DerBoghossian, for his part, would be responsible for making all payments on the loan directly to the lender, including insurance and taxes to be paid to an impound account. DerBoghossian or his family would improve the property and reside there once the improvements were completed. At trial DerBoghossian likened the arrangement to a trust in which Harris agreed to hold legal and record title to the property in his name for the benefit of DerBoghossian. DerBoghossian testified he and Harris had contemplated refinancing the property and removing Harris as record title holder at some point, but did not discuss when that would take place.

3

Harris, on the other hand, testified he participated in the transaction DerBoghossian had proposed reluctantly and only with the express agreement that DerBoghossian would obtain financing within 90 days to purchase the property in his own name and relieve Harris of any obligation under the loan.

c. *The initial loan and execution of grant deeds*

In May 1995 Harris obtained a home loan from Countrywide in the amount of $148,500, secured by the property, and purchased the property from Hagop DerBoghossian. The conveyance was recorded with the Office of the Los Angeles County Recorder on June 2, 1995.

The circumstances surrounding Harris's execution of the loan documents were disputed at trial. DerBoghossian testified he had obtained the documents from Countrywide and brought them to Harris for his signature. At the same time Harris signed the loan documents, he was given, and knowingly signed, a grant deed conveying the property to DerBoghossian. (A copy of the May 24, 1995 deed was introduced into evidence.) DerBoghossian explained, although he trusted Harris like a brother, he knew it was important to obtain a grant deed from Harris to ensure his position as the "true and intended owner" of the property in the event their relationship soured or something happened to Harris. DerBoghossian and Richelle Prosch, DerBoghossian's friend who notarized the loan documents, both testified Harris did not discuss or impose any conditions on the conveyance when he signed the deed and handed it to DerBoghossian. DerBoghossian also explained he did not record the deed immediately because he knew it would cause Countrywide to "call the loan" and thereby undermine his arrangement with Harris. He testified Harris was well aware he had signed the grant deed; in fact, Harris asked him several years later whether DerBoghossian still had the deed.

Harris, in contrast, testified he had no recollection of seeing, much less signing, the May 24, 1995 grant deed. In fact, he stated he first learned of the document when DerBoghossian recorded the deed in 2009 after a dispute had arisen between the two men. At trial Harris acknowledged the signature on the May 24, 1995 grant deed looked like his, but testified he had no recollection of signing the document. He did not intend to

4

convey the property to DerBoghossian in May 1995. Rather, according to Harris, they had agreed Harris would retain legal title until DerBoghossian refinanced the property and removed him from the debt obligation.

#### d. *The parties' performance under the oral agreement; and a purported written lease agreement*

In June 1995 and for several years thereafter, the parties operated in accordance with their mutually described oral agreement: Harris, as record title holder, remained liable on the loan and took advantage of available tax deductions. DerBoghossian improved the property to make it habitable for his family, who moved in to the residence in 1997, and made all payments, including principal, interest, taxes, maintenance and insurance, directly to the lender.

According to Harris, in June 1998 he learned his debt obligation on the property was impeding his ability to obtain a loan for another purpose. To show the lender he had income from the property, he asked DerBoghossian to reduce what he referred to as "their rental agreement" to writing. DerBoghossian supplied Harris with a written lease agreement, purportedly signed by Hagop DerBoghossian,[1] in which Hagop agreed to pay Harris a monthly rent of $1,400; Harris would accept, in lieu of rent, payment in full on the Countrywide loan, inclusive of principal, interest, taxes and insurance. DerBoghossian denied he had ever prepared the agreement or signed Hagop's name. He insisted there had been no written agreement between the parties; Harris had fabricated it entirely; and the purported lease agreement did not accurately reflect their oral agreement with respect to the property.

---

[1]    In its statement of decision the court credited expert testimony that the signature on the agreement was not Hagop DerBoghossian's. Nevertheless, the court found this point largely immaterial, accepting Harris's testimony the agreement with Hagop's purported signature had been provided to Harris by DerBoghossian.

5

e. *The new loan*

In early 1999 DerBoghossian and Harris discussed refinancing the property to obtain a lower interest rate. DerBoghossian testified he proposed at that time taking the loan out of Harris's name but Harris insisted he wanted to remain record title holder to continue to benefit from the tax deduction. Harris testified he had asked, as he had several times previously, for DerBoghossian to remove him from the loan and obtain the new loan in DerBoghossian's or someone else's name, but DerBoghossian said he was unable to do that "at this time" because "Hagop wasn't ready" to assume ownership. Whatever the parties' motivations, it is undisputed that in April 1999 Harris obtained a new loan from Countrywide in his name at a lower interest rate, secured by the property.

f. *The end of the parties' friendship; the notice to quit and initiation of unlawful detainer proceedings*

In late 2007 Harris was diagnosed with late stage renal failure and wanted to purchase a suitable home for himself while he awaited a kidney transplant. In 2008 he made an earnest money deposit of $15,000 on a condominium in Sylmar but then discovered the loan on the Glendale property was several months' delinquent and his credit history had been adversely affected. Harris was very upset and confronted DerBoghossian. DerBoghossian told Harris he was unaware any payments were delinquent, explaining he had arranged with his partner/employer to deduct the payments from his paycheck and pay the lender directly. DerBoghossian assured Harris he would address the situation immediately by bringing the debt current and taking over the payments himself. He also told Harris he would assist him with the Sylmar purchase by providing additional documentation and claiming responsibility for the late payments. In March 2009 the Sylmar purchase was cancelled, through no fault of Harris's; and Harris lost his earnest money deposit.

By May 2009 the two men were not speaking to each other. Harris began paying the loan on the property directly and returned to Hagop DerBoghossian any monies paid by his family. On May 29, 2009, fearing Harris would assert his rights as legal title holder to "steal the property" from him, DerBoghossian recorded the May 24, 1995 grant

6

deed Harris had purportedly given him. When Harris discovered the recording, he contacted law enforcement and reported the deed as a forgery. On June 5, 2009 Harris sent DerBoghossian's mother and brother, who were living on the property, a 60-day notice to terminate tenancy pursuant to the written rental agreement.

In August 2009 Harris initiated unlawful detainer proceedings. In September 2009 DerBoghossian obtained a loan from Moussighi, secured by the property, to assist him in resolving the unlawful detainer dispute with Harris. However, the proposed settlement of the unlawful detainer action fell apart; judgment of possession was entered in favor of Harris; and this action to quiet title ensued.

4. *The Trial Court's Statement of Decision and Judgment*

Following a seven-day court trial and the parties' submission of trial briefs and proposed findings of fact, the court issued its statement of decision, which began with the following observation: "The two main actors, Messrs. Hovsep DerBoghossian and Crutis Al[len] Harris II created an appearance of property interests to the world (including governments) and fifteen years later come to court disagreeing as to the true nature of their agreement and their legal relationships to the property in question. What a tangled web they wove." "As can be easily imagined, credibility issues abound in this matter, and neither side comes away unscathed; the court finds that both Hovsep [DerBoghossian] and Harris have severely impaired credibility on various issues of fact."

As to the May 24, 1995 grant deed, the basis for DerBoghossian's quiet title claim, the court found there was no legal delivery and thus no transfer of a property interest because Harris did not intend to convey title to DerBoghossian in 1995, whether or not he signed the May 24, 1995 deed: "The question is whether the deed was delivered. The court finds that Harris did not intend to convey the property without the release of the debt against himself (and his credit); to hold otherwise would be essentially contrary to all the evidence in the case and frustrate the intentions of the parties to the agreement for 'holding title'; thus, although Hovsep [DerBoghossian] held an unrecorded deed which by its terms would transfer title from Harris to Hovsep, it was nothing more than a security blanket, a piece of evidence of the intent of the parties, although that intention

7

was but partially expressed in the deed.  When Hovsep recorded that deed in 2009, it was effectively an attempt to separate the security from the debt (i.e., Hovsep would then hold title to the property, subject to the lien of the lender, while Harris would still be responsible for the debt that he had assumed in the acquisition of the property)—this was never the contemplation of the parties according to the evidence.  There was no evidence that the parties intended to separate the title to the security from the debt at any time; certainly such a separation would require the consent of the lienholder to be effective, and there likewise is no evidence the lienholder was asked to consent to such a transfer.  [Fn. omitted.]  Clearly, Harris had absolutely no intention to pass title to Hovsep—that very notion was against the precise arrangement they had made.  Therefore, the court finds that there was no delivery of the [g]rant [d]eed in question and that said grant deed was ineffective to convey any interest whatsoever in the property, and its recording was a nullity, other than being a cloud on title.  The court finds that title remained in Harris pursuant to the deed from Hagop in 1995, despite the recordation of the [g]rant [d]eed from Harris to Hovsep."

The court quieted title to the property in favor of Harris, subject to Countrywide's lien, which, it explained, was owned by Countrywide's successor-in-interest, BAC, now known as Bank of America, N.A.  The court ruled against Harris on his legal claims, explaining Harris "has not proven damages that were within the contemplation of the parties when the agreement was made . . . ."  In addition, the court ruled Moussighi did not have a lien interest on the property because DerBoghossian had not owned it at the time of Moussighi's loan and thus could not use it as security for his debt.  It ruled in favor of Moussighi on his breach of contract claim against DerBoghossian.  Judgment was entered on November 14, 2012.

DerBoghossian timely moved for a new trial asserting, among other grounds, the trial court's findings were not supported by the evidence.  In particular, he argued the evidence was undisputed that Harris had physically delivered the grant deed to DerBoghossian; and thus the uncontroverted inference was that the deed was legally delivered.  The court denied the new trial motion, concluding the evidentiary inferences

8

that arise with respect to a grantee's possession of the deed had been rebutted by ample evidence that Harris had no intention to transfer ownership to DerBoghossian in May 1995 while he remained liable on the loan.

## DISCUSSION

1. *Governing Law and Standard of Review*

A deed is a written instrument conveying or transferring the title to real property. (*Estate of Stephens* (2002) 28 Cal.4th 665, 671-672.) A deed transfers title only when it is legally delivered. (Civ. Code, § 1054; *Whitney v. American Ins. Co.* (1900) 127 Cal. 464; *Luna v. Brownell* (2010) 185 Cal.App.4th 668, 673.) "'Delivery is a question of fact'" and is entirely dependent upon the intention of the grantor to make a present transfer of property. (*Whitney,* at p. 567; accord, *Huth v. Katz* (1947) 30 Cal.2d 605, 608 ["[a] valid delivery of a deed depends upon whether the grantor intended that it should be presently operative"]; *Miller v. Jansen* (1943) 21 Cal.2d 473, 477 ["delivery or nondelivery [is] a question of fact to be determined from the surrounding circumstances of the transaction, and that whatever method of delivery be adopted, it must show by acts or words or both that the grantor intended to divest himself of title"].)

A grantee's physical possession of a deed raises an inference that the instrument was legally delivered. (*Miller v. Jansen, supra,* 21 Cal.2d at p. 477; *Hotaling v. Hotaling* (1924) 193 Cal. 368, 381-382 (*Hotaling*).) However, that inference may be rejected in favor of contrary evidence the grantor did not intend to presently pass title. (*Huth v. Katz, supra*, 30 Cal.2d at p. 608; *Hotaling*, at p. 383 ["[t]o constitute delivery of a deed it is not sufficient that there be a mere delivery of its possession, but this act must be accompanied with the intent that the deed shall become operative as such"]; *Estate of Pieper* (1964) 224 Cal.App.2d 670, 685-686 [possession by the grantee of a deed gives rise to an inference the instrument was duly delivered; "[s]uch inference is rebuttable, and in the face of contrary evidence becomes a consideration of fact for the trial court"].)

The trial court's factual determination as to whether the grantor intended to make a present transfer of property is reviewed for substantial evidence. (*Huth v. Katz, supra,* 30 Cal.2d at pp. 608-609; *Luna v. Brownell, supra*, 185 Cal.App.4th at p. 673 ["'[w]here

9

there is substantial evidence, or where an inference or presumption may be drawn from the evidence to sustain the court's finding of delivery or nondelivery, the finding will not be disturbed on appeal'"]; *Condencia v. Nelson* (1960) 187 Cal.App.2d 300, 302-303 [same].)

     2. *Substantial Evidence Supports the Trial Court's Finding of Nondelivery*

     DerBoghossian contends undisputed evidence established that Harris signed and physically delivered the May 24, 1995 grant deed to him at the time Harris executed the loan documents. Accordingly, he argues, the trial court's finding of nondelivery is not legally supportable. However, as the court explained when it denied the new trial motion, DerBoghossian's argument disregards Harris's testimony that, under the parties' oral agreement, he was to remain legal title holder for as long as he was liable on the loan. Indeed, DerBoghossian himself similarly testified the intent of their agreement was to make Harris legal title holder, not DerBoghossian. This testimony is more than sufficient to support the court's finding of nondelivery. (*Hotaling, supra,* 193 Cal. at p. 383 [substantial evidence supported trial court's finding manual transfer of deed with understanding it would not be effective unless the grantor died and deed was recorded did not effect delivery; grantor did not intend to make a present transfer of property]; *Estate of Pieper, supra,* 224 Cal.App.2d at p. 687 [same]; *Kelly v. Bank of America National Trust and Savings Assn.* (1952) 112 Cal.App.2d 388, 396-397; cf. *Barceloux v. Barceloux* (1931) 214 Cal. 516, 520 [substantial evidence supported trial court's finding of delivery; the two brothers "understood the effect of executing and handing over to a grantee such a conveyance" and intended to make a present transfer of title].)

     DerBoghossian contends that delivery of the deed to him on condition he not record it and Harris remain as record title holder for as long as Harris was obligated on the loan constituted an impermissible conditional delivery. (See Civ. Code, § 1056 ["A grant deed cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery was made."]; *Ivancovich v. Sullivan* (1957) 149 Cal.App.2d 160, 164 ["'[t]he law is well settled, where a deed, absolute in

10

form, is delivered by the grantor to the grantee personally, title vests in the grantee, discharged of any condition on which the delivery was made'"].)  Accordingly, even accepting Harris's version of events, as the trial court did, DerBoghossian argues the conditions were effectively discharged and the delivery made absolute upon transfer.

DerBoghossian's argument that delivery cannot be conditional—that is, it is either effective as a present transfer of property interest or void—is sound; his application of that rule in this context, however, is not, as the Supreme Court explained in *Hotaling, supra,* 193 Cal. at pages 381-382:  "The validity of this rule [in Civil Code section 1056] is not open to question, but it comes into application only when there has been a delivery. The question whether or not such delivery has taken place is a question of fact involving the intent of the parties."  (See also *id.* at p. 383 ["[t]o justify the application of the rule there must at least be a delivery of the deed, which implies the intent that it shall become at once operative, either absolutely or conditionally"]; *Estate of Pieper, supra,* 224 Cal.App.2d at p. 688 ["This rule [Civ. Code, § 1056] comes into application only where there *has been* a delivery, which implies the intent that it shall become at once operative, either absolutely or conditionally. . . .  Accordingly, while *delivery* of a deed to a grantee is necessarily absolute under the rule laid down in section 1056 of the Civil Code, a question may remain as to whether there has been such a delivery with the intent to transfer title."]; *Ivancovich v. Sullivan, supra,* 149 Cal.App.2d at p.164 ["When conditions are expressed concurrently with the manual delivery of a deed, the grant is either absolute or void.  The determination of whether the manual delivery was valid or ineffectual turns upon the question of the grantor's intent."].)

Here, the trial court found Harris had no intention to divest himself of the property while he remained liable on the loan.  The manual delivery of the deed to DerBoghossian under those circumstances, the court found, was nothing more than a good faith gesture— a promise to convey the property in the future after his name was removed from the debt obligation, rather than a current transfer of title.  The court also emphasized DerBoghossian's own actions in failing to record the deed until 14 years after the purported transfer.  Although DerBoghossian correctly asserts a grantee's failure to

11

record a deed does not make a transfer ineffective (see *Casey v. Gray* (1993) 13 Cal.App.4th 611, 614; Civ. Code, § 1217 ["an unrecorded instrument is valid as between the parties thereto and those who have notice thereof"]), the court may consider it, among other things, in evaluating the parties' intent at the time the deed was executed. (See *Estate of Pieper, supra*, 224 Cal.App.2d at p. 686; see generally *Kelly v. Bank of America Trust and Savings Assn.*, *supra,* 112 Cal.App.2d at pp. 396-397 [in examining sufficiency of evidence to support court's finding of nondelivery of a deed, """"an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion"""].)

In sum, the court found the inference of delivery raised by DerBoghossian's possession of the May 25, 1995 grant deed was overcome by contrary evidence, most notably Harris's testimony, that he lacked the intent to make a present transfer of title to DerBoghossian. That finding is amply supported by the evidence in the record.

3. *DerBoghossian's Remaining Arguments Do Not Support a Quiet Title Judgment*

Shifting his attention from the May 24, 1995 deed to the earlier grant deed transferring the property from Hagop DerBoghossian to Harris, DerBoghossian argues the initial conveyance to Harris was intended to make Harris legal owner and DerBoghossian and his family, the beneficial owner; that is, the intent of the parties was for Harris to hold legal title in trust in favor of DerBoghossian and his family. That type of argument, which concedes the defendant's legal title but seeks to have the legal title holder declared a constructive or resulting trustee, is misdirected in this quiet title action. (See *South San Bernardino Land & Improvement Co. v. San Bernardino National Bank* (1899) 127 Cal. 245, 248 [proper action for plaintiff claiming defendant held legal title in trust was not quiet title claim, in which court is asked to determine legal title holder, but an action to specifically enforce a contract for a trust]; *Melvin v. Melvin* (1908) 8 Cal.App. 684, 688 [demurrer properly sustained to plaintiff's quiet title action where plaintiff's complaint averred she was not the legal title holder but rather the beneficial

12

title holder; plaintiff's proper remedy under those circumstances is to seek to enforce trust agreement]; see also 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 655 [distinguishing a quiet title action from an action to enforce an express or implied trust; "[a]n action to have the defendant declared a constructive or resulting trustee for the plaintiff proceeds on the theory that the defendant has legal title, while a quiet title action seeks a determination that the defendant has no title"].)

DerBoghossian's complaint pleaded only a single cause of action to quiet title; he asserted no other claims and, apart from an injunction to enjoin the then-pending unlawful detainer action, sought no other specific remedy. Whatever merit there may be to DerBoghossian's contract and trust-related arguments, they are based on causes of action and legal theories not presented in his complaint and do not compel reversal of the judgment quieting title to the property in Harris's name.

## DISPOSITION

The judgment is affirmed. Harris is to recover his costs on appeal.


                                                   PERLUSS, P. J.
We concur:


        WOODS, J.


        ZELON, J.


13